**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Michael Mitchell, | ) | No. CV-06-1963-PHX-MHM |
| Plaintiff, | ) ) | |
| v. | ) ) | **AMENDED ORDER** |
| Joseph M. Arpaio, | ) ) ) | |
| Defendant. | ) ) ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]

Michael Mitchell ("the Plaintiff") filed suit against Maricopa County Sheriff Joseph Arpaio ("the Defendant") on August 14, 2006. The Plaintiff's prisoner civil rights complaint alleges claims for severe overcrowding (resulting in extremely unsanitary conditions),

---

[1] The original Order was issued in this case on September 5, 2008. Upon further review, however, the Court has discovered that the Defendant misstated the law in the Ninth Circuit with respect to the physical injury requirement for the Plaintiff's suit. See Oliver v. Keller, 289 F.3d 623, 630 (2002) (holding that "§1997e(e) applies only to claims for mental and emotional injury."). Even absent physical injury, a prisoner is entitled to seek compensatory, nominal and punitive damages premised on violations of constitutional rights. Id. at 629-30. Further complicating matters is the fact that the Plaintiff appeared to agree with the Defendant's misstatement of the law. [See Plaintiff's Proposed Findings of Fact and Conclusions of Law, p. 84]. Although the appropriate standard under the Ninth Circuit does not affect the outcome of the case, the Court issues this amended Order to clarify the requirements for prisoner suits in the Ninth Circuit.

1  inadequate nutrition and excessive use of force (due to the County's alleged policy of
2  shackling inmates during transport for up to twenty-one hours at a time).

3        This matter was tried before the Court sitting without a jury on April 8, 2008.  The
4  Plaintiff was represented by Dawn Valdivia and Benjamin Naylor of Quarles & Brady LLP,
5  and the Defendant was represented by J. Arthur Eaves of Sanders & Parks, P.C.  At the
6  conclusion of trial, the Defendant moved for a directed verdict in his favor.  The Court took
7  the matter under advisement.  Having considered all of the evidence submitted at trial, the
8  exhibits admitted into evidence and the arguments of counsel, the Court enters the following
9  Findings of Fact and Conclusions of Law.

10 I.  FINDINGS OF FACT

11 1. The Plaintiff was incarcerated at the Towers and Madison Jails in Maricopa County from
12 August 14, 2004 to May 31, 2007.

13 2. During his incarceration, the Plaintiff was a pretrial detainee — i.e., he had not yet been
14 convicted of the crime or crimes with which he was charged.

15 3. During his initial incarceration in Towers Jail, the Plaintiff was housed for several days
16 in a "day room" with thirteen to fourteen other inmates.  At nighttime, all of the thirteen or
17 fourteen inmates shared one toilet and sink.

18 4. For the first five or six nights of his incarceration, the Plaintiff slept in a "portable boat"
19 on the floor.  The canoe-shaped "boat" contained a mattress, sheet and blanket.  These items
20 were rolled up and stored against the wall during the daytime.  For the remainder of the time
21 that the Plaintiff was in the day room, he slept in the bottom bunk of a bed.

22 5. After seven to nine days of being housed in the day room, bed space opened up in a cell.
23 Thereafter, the Plaintiff slept in the bottom bunk of a cell that contained a triple bunk bed.
24 The cell also contained a sink, toilet, one table and one stool.

25 6. In January of 2005, the Plaintiff was moved to Madison Jail, where he was housed until
26 April 15, 2005.  In Madison Jail, the Plaintiff was the third inmate in a double bunk cell.  He
27 again slept on the floor in a portable boat.

28

7. In Madison Jail, the Plaintiff felt what he believed to be insects crawling "all over the place." [Transcript ("Tr."), 20:17-19]. He also saw what he thought were mice walking back and forth in front of the crack at the bottom of the door. He testified that when the lights came on in the morning, the roaches would scatter in order to try to hide under the bunks and in the cracks. The Plaintiff claims to have been bitten on the arm by a roach "[a] couple of times." [Tr., 20:24 - 21:4].

8. After approximately a week of sleeping on the floor in the boat, one of his cellmates went to prison, at which point the Plaintiff took the top bunk of the bunk bed.

9. The Plaintiff was then moved back to Towers Jail, where he spent the remainder of his time.

10. The Plaintiff requested that he be placed in "voluntary administrative segregation" while incarcerated. This allowed the Plaintiff to remain in his cell for 23 hours per day in order to be protected from the other inmates in the prison population. As a result of the voluntary administrative segregation, the Plaintiff was required to take a shower, clean his cell, make phone calls and participate in recreation activities in the one hour out of his cell each day.

11. As a result of the voluntary administrative segregation, the Plaintiff ate his meals in his cell. Because he had the shortest tenure of his two cellmates, the only comfortable place to eat his meals was sitting on the toilet in the cell. He placed a chess board across the sink as part of a makeshift table on which to eat.

12. The Plaintiff was occasionally denied his one hour out of his cell when the Maricopa County Correctional Services were short-staffed.

13. Inmates in voluntary administrative segregation were expected to clean their cells each day during their one hour out. They were given access to cleaning supplies each day, including a mop, toilet brush, a bucket, spray sanitizer and/or bleach.

14. Each corrections officer had the responsibility to inspect, inventory and replenish the cleaning supplies at the start of his or her shift.

15. The Plaintiff was often dissatisfied with the adequacy of the supplies provided. He testified that the mop and toilet brush were frequently filthy, and that the spray bottles of sanitizer were sometimes empty or watered down.

16. The Plaintiff purchased additional items from the jail canteen to clean his cell, including soap, shampoo and toothpaste.

17. The Plaintiff was also dissatisfied with the cleanliness of the communal shower. He filed one grievance regarding the condition of the shower. The shower was repaired (soap buildup removed and drain unstopped) within forty-eight hours, and the Plaintiff did not pursue the grievance further.

18. If an inmate does not clean his cell, ultimately a trustee or team of trustees under the supervision of an officer will clean the cell. The trustees are also responsible for cleaning and sanitizing the common areas (including the showers) of the jail.

19. The Plaintiff developed an infection on his arm toward the end of 2004. He describes it as a staph infection, but his medical records do not indicate that he was ever specifically diagnosed with staph. The medical records variously describe his condition as cellulitis, erythema, lesions, lacerations, abscesses, an open wound and edema. [Exhibit 1].

20. The Plaintiff attributes the infection to several possible sources: "A combination of the [insect] bites, a combination of the unsanitariness of the jail. The roaches, if you notice right here, there's another drawing that I have from the inside of the cell looking out. You've got rust gratings that are on the doors. That's exactly what it is, is rust. There's no paint, nothing . . . so by leaning on it, which you would have to lean on it to look out your door to look at the TV, which is positioned up on the wall." [Tr., 46:18-47:3]. The Plaintiff testified that he also at one point "believed it was a pimple." [Tr., 35:6-7].

21. The Plaintiff's medical records do not attribute the cellulitis to being bitten by a roach or spider. The records also do not report that the Plaintiff ever indicated that it was caused by an insect or rodent bite.

1  22. The medical records state that the Plaintiff's cellulitis is secondary to shaving. [Exhibit 1, MC-CHS-0018]. A follow-up entry in the medical chart indicates that the Plaintiff "states has had similar lesions on arm, but continues to shave." [Exhibit 1, MC-CHS-0021].

23. The Plaintiff admits that he shaves his arms "all the time," and has been shaving them since he started getting tattoos so that the tattoos are more visible. [Tr., 82:12-22]. At one point during the trial, the Plaintiff appears to admit that he never stopped shaving, despite receiving a recommendation by the medical staff to stop. [Tr., 83:12-20]. Later, he states medical staff advised him to stop shaving after his arm first became infected. He testifies that he stopped shaving, but that the infection "still came back." [Tr., 86:19-21].

24. The Plaintiff has scarring on his arm as a result of the infection.

25. Deputy Chief Mike Olson was in charge of the Towers and Madison Jail facilities during the entire period of the Plaintiff's incarceration. Policy dictated that he would be notified if any of the facilities under his supervision had exceeded maximum residency levels. He was not so notified.

26. The Plaintiff was served two meals per day. The first meal consisted of a sandwich, either potato chips or snack crackers, cookies, a piece of fruit and milk. The second meal contained food with the consistency of clam chowder that smelled like dog food. In addition, the vegetables and potatoes he was served would be either overcooked or undercooked.

27. The Plaintiff once found a cockroach in his food.

28. The cookies or chips, which were donated, were sometimes past their "sell-by" or "best-by" date.

29. The Plaintiff threw up a couple of times and had diarrhea. He got to the point where he would tell the staff that he did not want a meal. He decided to purchase his own food from the jail canteen.

30. The Plaintiff gained more than fifty pounds from the time he was arrested and committed to the Maricopa County Jail system in August of 2004 to the time he was released to the custody of the State Department of Corrections in May of 2007.

31. When the Plaintiff would complain about the food, he was told that the food was not a grievable issue and that he ought to quit complaining.

32. The food that was served at Towers Jail was prepared at the Durango Jail kitchen. The Durango Jail kitchen was inspected by Maricopa County Environmental Services Department. During several inspections while the Plaintiff was incarcerated, the Durango Jail kitchen was not in compliance with its duties to properly conduct pest control. [Exhibit 18]. Cockroaches, flies, live mice and mouse droppings were repeatedly noted. [Id.].

33. The County has contracts with pest control companies that spray for pests monthly in the jail kitchens.

34. There is a dietician and a member of the Maricopa County Sheriff's Office at the Durango Jail kitchen who are tasked with inspecting the food to ensure that inmates' meals are edible and up to standard.

35. No facility supplying food to the Plaintiff during his incarceration was ever shut down by the Health Inspector.

36. Pursuant to the policy of the Maricopa County Sheriff's Department, inmates were handcuffed and shackled during transportation to court appearances. On these occasions, the Plaintiff was shackled from anywhere between seven hours and twenty-one hours. When he tried to complain, the Plaintiff was told that transportation was not grievable.

37. The grievance procedure in the Maricopa County Jail system has a number of different steps and several levels of appeal.

38. When inmates arrive at the jail and are processed, they are supposed to be provided with a booklet of rules and regulations that explain the grievance procedure. The inmates are supposed to sign the back of the booklet, and a copy of their signature is placed in the inmates' "facility file" as proof that they received a copy. [Tr., 126:3-14].

39. The Plaintiff did not receive a copy of the rules and regulations regarding grievances upon arrival, and no copy of his signature appears as part of the Court's record. At some point, the Plaintiff became aware of how to successfully navigate the grievance procedures. [See Exhibits 5-16].

40. The Plaintiff exhausted a grievance regarding the perceived overcrowding in the jail.

41. At times, detention officers would fail to provide the Plaintiff with requested grievance forms.

42. The Defendant is charged with running the Maricopa County Sheriff's Office; the Sheriff's Office is solely responsible for running the Maricopa County jails. The Sheriff is ultimately responsible for implementing the various policies and procedures of the jails.

43. The Sheriff does not believe that the county jails are overcrowded.

## II. CONCLUSIONS OF LAW

1. The Plaintiff may not bring an action with respect to prison conditions without first exhausting all of his administrative remedies. 42 U.S.C. § 1997e(a).

2. The Plaintiff may not bring a civil action for mental or emotional injuries arising from prison conditions without a prior showing of physical injury. 42 U.S.C. § 1997e(e); Oliver v. Keller, 289 F.3d 623, 630 (9th Cir. 2002). The "physical injury" need not be significant to meet the requirement, but it also must not be *de minimis*. Id.

3. The Plaintiff bears the burden of proof to prove his 42 U.S.C. § 1983 claim at trial. Greenawalt v. Sun City West Fire Dist., 250 F. Supp. 2d 1200, 1218 (D. Ariz. 2003).

4. Because Sheriff Joe Arpaio is the sole defendant in the case, the Plaintiff must show that Arpaio "was aware of widespread abuses and, with deliberate indifference to the inmate's constitutional rights, failed to take action to prevent further misconduct." Ortez v. Washington County, Or., 88 F.3d 804, 809 (9th Cir. 1996).

5. Pretrial detainees have a substantive due process right under the Fourteenth Amendment to be free from restrictions that amount to punishment. Bell v. Wolfish, 441 U.S. 520, 536-37 (1979); Demery v. Arpaio, 378 F.3d 1020, 1023 (9th Cir. 2004).

6. Overcrowding is not unconstitutional per se, but it can result in certain effects that form the basis for a constitutional violation. Toussaint v. Yockey, 722 F.2d 1490, 1492 (9th Cir. 1984); Hoptowit v. Ray, 682 F.2d 1237, 1249 (9th Cir. 1982). These effects include increased violence, the reduction of other constitutionally required services such that they

fall below Eighth Amendment standards, and the deterioration of shelter to the point that it is unfit for human habitation. Hoptowit, 682 F.2d at 1249.

7. Inmates are entitled to reasonably adequate sanitation and personal hygiene, especially if their confinement is lengthy. Howard v. Adkinson, 887 F.2d 134, 137 (8th Cir. 1989).

8. The Eighth Amendment requires that prisoners be served food that is adequate to maintain health. There is no requirement that the food be tasty or aesthetically pleasing. LeMaire v. Maass, 12 F.3d 1444, 1456 (9th Cir. 1993). Food that is served cold or that sometimes contains foreign objects satisfies the Constitution. Id. (internal quotations and citations omitted).

9. Use of force violates the Eighth and Fourteenth Amendments where force is applied maliciously and sadistically for the very purpose of causing harm, and not in a good faith effort to maintain or restore discipline. Rankin v. Klevenhagen, 5 F.3d 103, 105-06 (5th Cir. 1993).

### A. Exhaustion

10. The Court gives the Plaintiff the benefit of the doubt as to exhaustion of his administrative remedies. The Court finds that the Plaintiff was likely not provided with a copy of the jail's rules and regulations, and therefore was unable to effectively exhaust his administrative remedies. The Court also gives the Plaintiff the benefit of the doubt that he was occasionally denied grievance forms or was told that certain issues (such as food quality and transportation) were not grievable. The Court finds that the Plaintiff's informal notice of complaints is sufficient to support his claim that he was unaware of the grievance procedures. Baker v. Schriro, No. 07-0353, 2008 WL 2003757, at *2 (D. Ariz. May 8, 2008). The Court notes that the Plaintiff started filing multiple grievances beginning in April of 2006, and presumes that the Plaintiff had sufficient knowledge of the grievance procedure to successfully exhaust his remedies from that point forward.

### B. Overcrowded and Unsanitary Conditions

11. The Court finds that the Plaintiff also failed to meet his burden to show a deterioration of shelter to the point that it was unfit for human habitation in violation of the Eighth

Amendment. Hoptowit v. Ray, 682 F.2d 1237, 1249 (9th Cir. 1982). Although he complains of several unpleasant and difficult conditions during his incarceration, including triple-bunking, the use of portable "boats" for extra beds, the presence of insects and dirty showers, the Court does not find that these conditions rise to the level of constitutional violations. Further, there is evidence that some of the Plaintiff's complaints were remedied by the grievance procedure. [See, e.g., Exhibit 13 (shower cleaned and repaired the day after the Plaintiff's grievance filed)].

### C. Food and Nutrition

12. The Court does not find that the Plaintiff has met his burden to prove that the food was inadequate to maintain health. The Plaintiff admitted that he gained more than fifty pounds in the Maricopa County Jail system — though he attributes the weight gain to junk food purchased from the jail canteen. [Tr., 206:7-11]. The Plaintiff's unsupported factual allegation that he threw up a couple of times and suffered diarrhea, if true, do not amount to a constitutional violation. The food need not be tasty or aesthetically pleasing to pass constitutional muster. LeMaire v. Maass, 121 F.3d 1444, 1456 (9th Cir. 1993). Further, that the food is sometimes served cold, occasionally contains foreign objects, or is over- or undercooked is similarly not actionable. Id. (citations omitted).

### D. Excessive Force (Lengthy Shackling of Transported Inmates)

13. The Plaintiff alleges that he was shackled for up to twenty-one hours while being transported with other inmates to court appearances, and his testimony was not refuted by the Defendant. Although the Plaintiff's attorneys argue that he was deprived of food and effective access to the toilet, this conclusion is not borne out by the Plaintiff's trial testimony.

14. The Court finds further that the County's policy of shackling inmates during transport does not constitute force applied maliciously and sadistically for the very purpose of causing harm, as opposed to a good faith effort to maintain or restore discipline. Rankin v. Klevenhagen, 5 F.3d 103, 105-06 (5th Cir. 1993). The policy of the Maricopa County Sheriff's Office is to restrain all inmates outside of the jail except in limited, prescribed circumstances. [Policy on Transportation and Restraint of Prisoners and Inmates, Exhibit

28]. The purpose is not to punish or cause harm to inmates, but rather "to protect the lives and promote the safety of the Officers, the public, and the person being transported." [Id.] Accordingly, the Court finds that the Plaintiff has not met his burden to demonstrate the length of shackling was constitutionally impermissible form of punishment, as opposed to a method of promoting the safety and well being of the Officers, the public and the inmate himself..

15. The Defendant is entitled to judgment dismissing the Plaintiff's Complaint with prejudice.

Accordingly,

**IT IS ORDERED** dismissing the Plaintiff's Complaint with prejudice.

**IT IS FURTHER ORDERED** denying the Defendant's oral Motion for Directed Verdict as moot.

**JUDGMENT ENTERED ACCORDINGLY.**

DATED this 15th day of September, 2008.

_____
Mary H. Murguia
United States District Judge